## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

DR. STANLEY M. BERRY,

        Plaintiff,

v.

BOARD OF GOVERNORS OF WAYNE STATE
UNIVERSITY, DR. SATINDER KAUR, in her
individual capacity, DR. PATRICIA WILKERSON-UDDYBACK,
in her individual capacity, and DR. WAEL SAKR,
in his individual and official capacities,

        Defendants.

Case No. 23-cv-10981
Hon. Jonathan J.C. Grey

---

| | |
|---|---|
| Amanda M. Ghannam (P83065) | Brett J. Miller (P68612) |
| Schulz Ghannam PLLC | Butzel Long PC |
| 645 Griswold St., Suite 4100 | 150 W. Jefferson Ave., Suite 100 |
| Detroit, MI 48226 | Detroit, MI 48226 |
| (313) 788-7446 | (313) 225-7000 |
| amanda@michiganworkerlaw.com | millerbr@butzel.com |
| *Counsel for Plaintiff* | *Counsel for Defendants Sakr, Kaur,* |
| | *And Board of Governors of WSU* |
| | |
| | Benjamin W. Jeffers (P57161) |
| | Hickey Hauck Bishoff Jeffers & |
| | Seabolt, PLLC |
| | 1 Woodward Ave., Suite 2000 |
| | Detroit, MI 48226 |
| | (313) 964-8600 |
| | bjeffers@hhbjs.com |
| | *Counsel for Defendant Uddyback* |

---

## PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiff, Dr. Stanley M. Berry, through counsel, brings this First Amended Complaint against Defendants Board of Governors of Wayne State University, Dr. Wael Sakr, in his individual and official capacities, Dr. Satinder Kaur, in her individual capacity, and Dr. Patricia Wilkerson-Uddyback, in her individual capacity, as follows:

## INTRODUCTION

1.     This lawsuit arises out of Wayne State University's retaliatory failure to hire Dr. Stanley M. Berry, then-Interim Chair of the Department of Obstetrics and Gynecology, as permanent Chair after Dr. Berry raised the very serious issue of bias against Black patients in healthcare.

2.     Defendant Dr. Wael Sakr, Dean of the University's School of Medicine, told Dr. Berry that his colleagues "don't love [him]" because of his outspoken determination that the Department address the issue to prevent racial disparities in maternal and fetal deaths in WSU's residency program.

3.     Dr. Sakr then hired another candidate, who is non-Black and objectively less qualified than Dr. Berry, who is Black, for the permanent Chair position, despite confiding in Dr. Berry that the other candidate was "less than ideal."

## PARTIES, JURISDICTION, AND VENUE

4.      Plaintiff, Dr. Stanley M. Berry ("Dr. Berry"), is a resident of the Eastern District of Michigan and a current employee of Wayne State University's School of Medicine.

5.      Wayne State University ("WSU") is an institution of higher education created by the Michigan Constitution. M.C.L. § 390.641.

6.      Defendant, the Board of Governors of Wayne State University, is the corporate body responsible for managing Wayne State University's affairs and property and the body capable of suing and being sued on WSU's behalf. M.C.L. § 390.641.

7.      Defendant, Dr. Wael Sakr, is the Dean of WSU's School of Medicine. He is sued in his official and individual capacities.

8.      Defendant, Dr. Satinder Kaur, is an Assistant Professor and the Director of WSU School of Medicine's Residency Program, which is jointly operated by WSU and the Detroit Medical Center (DMC). She is sued in her individual capacity.

9.      Defendant, Dr. Patricia Wilkerson-Uddyback, is the Vice President of Academic & Community Affairs at the Detroit Medical Center and, at all relevant times, was a faculty member at Wayne State University. On information and belief, in this role, Dr. Wilkerson-Uddyback was jointly employed by the Detroit Medical Center and Wayne State University. She is sued in her individual capacity.

10.     This Court has general federal question jurisdiction pursuant to 28 U.S.C. § 1331, Title VI of the Civil Rights Act of 1964, and 42 U.S.C. 1983.

11.     This Court has supplemental jurisdiction of Plaintiff's state law claims pursuant to 28 U.S.C.A. § 1367.

12.     Venue is proper in this Court because Defendants obligated themselves to Plaintiff within the Eastern District of Michigan, the University is located within the Eastern District of Michigan, Plaintiff resides within the Eastern District of Michigan, and, upon information and belief, Defendants reside within the Eastern District of Michigan.

13.     Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission, received a notice of right to sue on January 17, 2024, and timely files his claims under Title VII of the Civil Rights Act of 1964 pursuant to his notice of right to sue.

14.     Pursuant to Fed. R. Civ. P. 15(a)(1)(B), Plaintiff files this Amended Complaint as a matter of course within 21 days of service of a responsive pleading (Defendant Uddyback's Answer, filed and served on April 1, 2024).

## STATEMENT OF FACTS

### Dr. Stanley M. Berry's Background

15.     Plaintiff, Dr. Stanley M. Berry, has been a member of Wayne State University's faculty between 1988-2001, and then again from 2005 to the present.

16.    Dr. Berry's research interests include high-risk obstetrics and prenatal diagnosis and therapy, concentrating on the use of fetal blood sampling to study fetal physiology.

17.    Dr. Berry's extensive list of accomplishments and experience in his field includes:

- The Willaford Leach/Armand Headee Professor of Obstetrics and Gynecology at Emory University;

- Chief of Service at Emory Crawford Long Hospital;

- Research project and educational mentor for the Detroit Medical Center/Wayne State University School of Medicine Maternal-Fetal Medicine Fellowship and Training Program;

- Administrator and clinician for the Center for Advanced Obstetrical Care and Research of the Perinatology Research Branch of the Eunice Kennedy Shriver National Institute for Child Health and Human Development at WSU;

- Medical director of Women's Services and Quality Improvement for Meridian Health Plan;

- Corporate Chair of Department of Obstetrics and Gynecology for William Beaumont Hospitals;

- Associate Chair of Obstetrical Services at WSU School of Medicine/Hutzel Hospital;

- Vice Chief of Obstetrics and Gynecology for WSU School of Medicine/Hutzel Hospital;

- Director of Maternal/Fetal Medicine Fellowship Program at WSU School of Medicine/Hutzel Hospital;

- Project Site Manager at the Perinatology Research Branch;

- National Chair of Student National Medical Association;

- Examiner for American Board of Obstetrics and Gynecology;

- Fellow Emeritus of American College of Obstetrics and Gynecology;

- Diplomate of National Board of Medical Examiners;

- Recipient of Central Prize and Certificate of Merit Award from Central Association of Obstetricians and Gynecologists;

- Recipient of President's Presenter's Award from the Society of Gynecologic Investigation Scientific Program Committee;

- Recipient of Outstanding Junior Faculty Award from WSU Department of Obstetrics and Gynecology; and

- 2020 TIME Magazine Coronavirus Hero.

18.    On January 25, 2021, Dr. Berry was appointed to serve as the Interim Chair and Frank P. Iacobell Professor of Wayne State University's Department of Obstetrics and Gynecology.

19.    Dr. Berry assumed his new role on March 15, 2021.

20.    Dr. Berry appointed his colleague, Dr. Lanetta Coleman, to serve as Executive Vice Chair of the Department of Obstetrics and Gynecology.

21.    Dr. Coleman was the first woman to be named Chief of Obstetrics and Gynecology at DMC Sinai-Grace Hospital.

22.    Dr. Berry is Black/African-American.

23.    Dr. Coleman is Black/African-American.

**Dr. Berry Raises Issue of Implicit Bias and Advocates for Black Patients**

24.    On January 14, 2022, Dr. Coleman reported a concern regarding a resident interaction with a Black patient at Sinai Grace to Dr. Satinder Kaur, Assistant Professor and Director of the School of Medicine's Residency Program, and Dr. Berry.

25.    Dr. Coleman wrote in an email:

There are many concerns regarding this patient's experience and the level of quality and care that she received… There is a large volume of information and studies available regarding pain management bias and inherent bias on labor and delivery. This patient interaction provides an opportunity to learn, teach, and be aware of how unrecognized bias can adversely affect patient care and clinical outcomes. Perhaps we can provide a training module on pain management in the antepartum patient.

26.    Dr. Coleman was referring to the many studies and resources addressing unconscious bias and racial disparities in healthcare, particularly maternal and infant health.

27.    For example, the Centers for Disease Control and Prevention has noted that Black women are three times more likely to die from a pregnancy-related cause than non-Black women, and has established Black Maternal Health Week to bring attention and action in improving Black maternal health.[1]

---

[1] See https://www.cdc.gov/healthequity/features/maternal-mortality/index.html, last accessed November 7, 2022.

28.     According to a 2016 study published in the Proceedings of the National Academies of Science, a shocking *half* of white medical trainees held one or more false beliefs about Black patients' experiences of pain. 40% endorsed the belief that Black people have "thicker skin". Trainees who believe that Black patients are less sensitive to pain than non-Black patients are less likely to treat Black patients' pain appropriately. A "meta-analysis" of 20 years of studies found that Black patients were 22% less likely than white patients to receive pain medication at all.[2]

29.     In short, Dr. Coleman's concerns were well-founded and legitimate.

30.     These issues had also arisen locally, and so Dr. Coleman and Dr. Berry were both rightfully concerned about the possibility of another disastrous outcome in this case. Importantly, the patient at issue had a history of preterm birth, which is the highest risk factor for delivering another premature baby.

31.     Dr. Kaur met with the resident and responded to Dr. Coleman and Dr. Berry.

32.     After reading Dr. Kaur's response, Dr. Berry was left with the impression that Dr. Kaur was not taking Dr. Coleman's concerns as seriously as the matter necessitated.

---

[2]  See  https://www.aamc.org/news-insights/how-we-fail-black-patients-pain,  last accessed November 7, 2022.

33.     On January 23, 2022, Dr. Berry asked Dr. Kaur to address the issue of

implicit bias in healthcare and communicate to the residents specifically that:

> It is not acceptable to send a pregnant woman in the third trimester who is complaining of extreme pain home [because] 1. Sending a patient in this condition home does not comport with the humane/compassionate practice of medicine. 2. Sending a patient home in this circumstance [severe pain in third trimester of pregnancy] does not comport with the safe practice of medicine because there is always a chance that this woman may have been in preterm labor.

34.     The following day, Dr. Kaur sent all of the Obstetrics & Gynecology

residents a link to a presentation entitled "It Starts With You: Examining Implicit

Bias in Healthcare Settings."

35.     However, Dr. Kaur's message to residents did not address the specific

issues that Dr. Berry had raised regarding the treatment of Black patients reporting

pain during pregnancy.

36.     In an email to Dr. Kaur and Dr. Coleman, Dr. Berry reiterated the

importance of sending the residents a memorandum "outlining the negatives of

sending pregnant women home who are in pain… Specifically, this communication

must highlight the lack of compassion and lack of patient safety such actions

represent. The memo must mention how inherent bias factors into such decisions."

37.     To address these issues, on January 26, 2022, Dr. Berry sent a

memorandum with the topic "Implicit Bias" to the Department of OB/GYN

Trainees, Faculty, and Private Attendings.

38.    Dr. Berry's memorandum stated in part:

This case is important because it is an example of how we need to improve our care of pregnant patients across our system. Another aspect of this case that is important to note is that the patient in this case was an African-American woman, and residents, fellows, and attendings need to be aware that the possibility of implicit bias may exist in these situations regardless of the race or ethnicity of the provider. The decision-making on the part of the resident in this case is an example of care that should not occur in our program or our institution regardless of whether implicit bias was a factor. Please be mindful of this case when confronted with a patient who has a similar clinical presentation regardless of the patients' race or ethnicity. As for the possibility of implicit bias, all of us need to be aware that we are capable of such bias, and the only way to eliminate such prejudices from our practice is to continually be aware that we may harbor them.

39.    In a follow-up email, Dr. Berry invited the department to discuss the

issues at a meeting to take place on January 27, 2022, and noted:

In my 38 years of working with and teaching trainees, I understand that mistakes are made everyday by everybody, and when these mistakes pose a real danger to patients, they need to be discussed openly, honestly, and in a timely manner. Given the fact that our hospital is currently the object of a lawsuit involving a case very similar to the one referred to in my memorandum, there was an urgency to bring this case to light in a way that reached as many providers as possible, as quickly as possible… Had this patient been discharged and then delivered a premature infant outside of the hospital, it could have been a disaster… I am not willing to discuss this case only in the context of implicit bias when the possible medical consequences to this patient and others are so astronomically grave…

Calling attention to this matter is my responsibility as Chari of this Department to publicly raise issues like this, and I am disappointed that some of you consider my urgent effort to end this substandard medical practice in poor taste. The best way to care for a particularly vulnerable community is to consistently deliver the best medical care possible and that is the sole objective of my communication…"

**Wayne State University Administrators and Faculty Lash Out at Dr. Berry**

10

40.     Then-Dean of the Wayne State University School of Medicine, Dr. Mark Schweitzer, canceled the meeting Dr. Berry had scheduled.

41.     On information and belief, Dr. Schweitzer canceled Dr. Berry's meeting at the request of Dr. Patricia Wilkerson-Uddyback, the Detroit Medical Center Graduate Medical Education Department's Vice President of Academic & Community Affairs.

42.     In lieu of Dr. Berry's meeting, the Department held a separate meeting on January 27, 2022, spearheaded by Dr. Wilkerson-Uddyback and Dr. Kaur.

43.     Dr. Berry and Dr. Coleman were not invited.

44.     At this meeting, Dr. Wilkerson-Uddyback and Dr. Kaur referred to Dr. Berry (and Dr. Coleman) as "bad apples"; stated that they would not allow them to "spoil the bunch"; referenced Dr. Berry's age in a negative light; hinted that they intended to complain about Dr. Berry and Dr. Coleman to the people in charge of faculty hiring and firing decisions; stated that Dr. Coleman had a "history of hostility"; and implied that residents shouldn't have to work with Dr. Coleman.

45.     Also on January 27, 2022, Dr. Kaur sent out a survey to all of the residents, stating: "We are collecting information about residents' preference with regard to working with Dr. Lanetta Coleman. Please select one of the choices below."

46.     The only two choices provided in this survey were "I would prefer NOT to work with Dr. Coleman" and "I have no preference one way or the other."

47.     The survey did not allow residents a way to express anything positive about Dr. Coleman and was designed to solicit negative results.

48.     Over the next few months, Dr. Kaur and Dr. Wilkerson-Uddyback continued to speak negatively about and solicit negative feedback regarding Dr. Berry's attempt to raise the serious issue of racial bias in maternal healthcare.

49.     Meanwhile, on March 1, 2022, Dr. Wael Sakr began to serve as interim Dean of the Wayne State University School of Medicine.

50.     Immediately after the new Dean began his position, Dean Sakr informed Dr. Berry that Dr. Wilkerson-Uddyback had requested a meeting to discuss her "concerns" about Dr. Berry's communications to the OB-GYN residency program.

51.     Dr. Berry told Dean Sakr that Dr. Wilkerson-Uddyback likely wished to discuss his memoranda, and he forwarded Dean Sakr the memoranda and emails he had written to the department outlining the importance of preventing implicit bias from leading to disastrous medical outcomes for Black patients and babies.

52.     On or about March 16, 2022, a colleague told Dr. Berry that Dr. Wilkerson-Uddyback was pushing for Dr. Berry's dismissal as Interim Chair because of his actions described herein.

53.     The colleague told Dr. Berry that Dr. Wilkerson-Uddyback had sent a written memorandum to the Dean that not only attempted to get Dr. Berry dismissed as Interim Chair of the Department, but to bar both Dr. Berry and Dr. Coleman from having any further contact with residents, an extreme and completely unnecessary course of action.

54.     Dean Sakr told Dr. Berry that the controversy that arose out of his memoranda was "in the past".

55.     However, it was clearly not.

56.     On March 23, 2022, Dean Sakr met with the full OB-GYN department.

57.     Dr. Berry was present for the first half-hour of this meeting, but then left to allow the department to discuss the department without him present.

**Defendant Promotes a Less Qualified, Non-Black Candidate to Department Chair Because of Dr. Berry's Race and Advocacy**

58.     Meanwhile, Dr. Berry learned that Dean Sakr intended to begin searching for candidates for the permanent Department Chair position.

59.     On April 22, 2022, Dr. Berry submitted his CV to Dr. Noreen Rossi, who was chairing the search committee for a permanent Chair of the OB-GYN Department, for consideration.

60.     Dr. Rossi told Dr. Berry that the Dean's search was not currently active.

61.     On June 2, 2022, after learning from a colleague, Dr. David Bryant, that he had applied for the position, Dr. Berry again expressed his interest in the position and submitted his CV directly to Dean Sakr for consideration.

62.     On July 6, 2022, Dean Sakr told Dr. Berry that he would not be considered for the permanent Chair position.

63.     Dean Sakr told Dr. Berry that their colleagues, including Dr. Kaur and Dr. Wilkerson-Uddyback, were not willing to work with him; on information and belief, because of his actions over the past six months in attempting to impress upon the Department the seriousness of implicit racial bias in maternal medicine.

64.     Dean Sakr told Dr. Berry: "They don't love you, and I don't think they ever will."

65.     Dean Sakr told Dr. Berry that he would instead be appointing Dr. David Bryant to the permanent Chair position.

66.     Dr. Bryant was objectively less qualified than Dr. Berry for the permanent Chair position.

67.     Dr. Bryant held the rank of Associate Professor, while Dr. Berry held the rank of Full Professor.

68.     As Interim Chair, Dr. Berry had the appropriate experience to lead the Department as Chair, while Dr. Bryant had no such experience.

69.     Dr. Bryant has significantly less research experience than Dr. Berry.

14

70.     Dr. Bryant has significantly less leadership experience than Dr. Berry.

71.     Dr. Bryant is not Black/African-American.

72.     Dean Sakr confided that his decision to appoint the other candidate was "not ideal," but that he felt he had little choice in the matter.

73.     Dr. Bryant took over the permanent Chair position on or about August 25, 2022.

74.     Dr. Berry retained the lesser title of Project Site Manager of the Perinatology Research Branch of the Eunice Kennedy Shriver National Institute of Child Health and Human Development.

75.     The Perinatology Research Branch closed on January 31, 2023.

76.     Dr. Berry now holds the lesser title of Professor of Obstetrics and Gynecology.

**COUNT I**
**Violation of Title VI of the Civil Rights Act of 1964**
*Against Defendant Board of Governors of Wayne State University*

77.     Plaintiff incorporates the preceding allegations as if fully restated herein.

78.     Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

79.   As a public university, Defendant Board of Governors of Wayne State University received and continues to receive federal financial assistance.

80.   Defendant subjected Plaintiff to intentional discrimination, excluded him from participation in, and denied him the benefits offered by the WSU School of Medicine by their conduct described herein, including but not limited to denying Plaintiff the position of/promotion to Chair of the School of Medicine's Department of Obstetrics and Gynecology.

### COUNT II
### Violation of the Equal Protection Clause of the
### Fifth and Fourteenth Amendments to the U.S. Constitution
### 42 U.S.C. 1983
*Against Defendants Sakr, Kaur, and Uddyback in their individual capacities*

81.   Plaintiff incorporates the preceding allegations as if fully restated herein.

82.   The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution provides that "no state shall…deny to any person within its jurisdiction the equal protection of the laws."

83.   42 U.S.C. § 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by persons acting under the color of law.

84.   Defendants Sakr, Kaur, and Wilkerson-Uddyback (the individual Defendants) acted under color of law when they engaged in the conduct described

herein, including but not limited to discriminating and retaliating against Plaintiff and denying him the position of/promotion to Chair of the WSU School of Medicine's Department of Obstetrics and Gynecology.

85.    Defendants Sakr, Kaur, and Wilkerson-Uddyback violated Plaintiff's clearly established constitutional rights of which any reasonable person in their position would have known; they are therefore not entitled to qualified immunity.

## COUNT III
## Race Discrimination in Violation of the Elliott-Larsen Civil Rights Act
## M.C.L. 37.2201 et seq.

86.    Plaintiff incorporates the preceding allegations as if fully restated herein.

87.    At all relevant times, Plaintiff was an employee and Defendants were employers as defined by the Elliott-Larsen Civil Rights Act, M.C.L. 37.2201 et seq.

88.    The State of Michigan has waived its Eleventh Amendment sovereign immunity and consented for Defendant Board of Governors of Wayne State University, an arm of the State, to be sued under the Elliott-Larsen Civil Rights Act.

89.    Plaintiff is a member of a protected class based on his race (Black).

90.    Plaintiff expressed interest in, applies for, and was qualified for the position of/promotion to permanent Chair of the WSU School of Medicine's Department of Obstetrics and Gynecology.

91.    Defendants considered for and denied Plaintiff the position/promotion.

92.     Defendants passed over Plaintiff for the position/promotion in favor of a less qualified candidate who was not a member of Plaintiff's protected class.

93.     Defendants' actions were taken willfully.

94.     But for Plaintiff's race, Defendants would not have denied him the position/promotion.

## COUNT IV
## Retaliation in Violation of the Elliott-Larsen Civil Rights Act
## M.C.L. 37.2201 et seq.

95.     Plaintiff incorporates the preceding allegations as if fully restated herein.

96.     At all relevant times, Plaintiff was an employee and Defendants were employers defined by the Elliott-Larsen Civil Rights Act, M.C.L. 37.2201 *et seq.*

97.     The State of Michigan has waived its Eleventh Amendment sovereign immunity and consented for Defendant Board of Governors of Wayne State University, an arm of the State, to be sued under the Elliott-Larsen Civil Rights Act.

98.     Plaintiff engaged in protected activity including, but not limited to, raising concerns of discrimination in the form of bias against Black patients by non-Black residents and physicians in University programs.

99.     Defendants were aware of Plaintiff's protected activity.

100.    Defendants retaliated against Plaintiff for his protected activity by subjecting him to adverse employment actions including, but not limited to, denying

him the position/promotion to Chair of the School of Medicine's Department of Obstetrics and Gynecology.

101.   Defendants' actions were taken willfully.

102.   But for Plaintiff's protected activity, Defendants would not have denied him the position/promotion.

## COUNT V
### Race Discrimination in Violation of Title VII of the Civil Rights Act
### 42 U.S.C. §2000e-2(a)(1); §2000e-2(m)

103.   Plaintiff incorporates the preceding allegations as if fully set forth herein.

104.   At all relevant times, Defendants were employers with greater than 15 employees and Plaintiff was an employee covered by and within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(b).

105.   Plaintiff is a member of a protected group under Title VII due to his race (Black/African-American).

106.   Defendant discriminated against Plaintiff because of his race in the terms and conditions of his employment in violation of 42 U.S.C. §2000e-2(a)(1).

107.   Defendant subjected Plaintiff to adverse employment actions, including failure to hire/promote Plaintiff as described herein.

108.   But for Plaintiff's race, Defendant would not have subjected Plaintiff to such adverse employment actions.

109.    Defendant's actions were motivated by unlawful discrimination against Plaintiff because of his race, even though other factors may have motivated their actions, in violation of 42 U.S.C. §2000e-2(m).

110.    Defendant's course of conduct was done with reckless disregard for Plaintiff's federally protected civil rights, entitling Plaintiff to punitive damages.

### COUNT VI
### Retaliation in Violation of Title VII of the Civil Rights Act
### 42 U.S.C. §2000e-3(a)

111.    Plaintiff incorporates the preceding allegations as if fully set forth herein.

112.    At all relevant times, Defendants were employers with greater than 15 employees and Plaintiff was an employee covered by and within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(b).

113.    Plaintiff engaged in protected activity including but not limited to opposing discrimination, bias, and prejudice against his Black colleagues and Black patients of WSU/DMC, as described herein.

114.    Defendants subjected Plaintiff to adverse employment actions, including but not limited to failing to hire/promote him as described herein.

115.    Defendants' actions were motivated by unlawful retaliation towards Plaintiff because of his protected activity in violation of 42 U.S.C. §2000e-3(a).

116.   But for Plaintiff's protected activity, Defendants would not have subjected Plaintiff to such adverse actions.

117.   Defendants' conduct was done with reckless disregard for Plaintiff's federally protected civil rights, entitling Plaintiff to punitive damages.

## DAMAGES

118.   As a direct and proximate result of Defendants' actions, Plaintiff has suffered damages, including but not limited to loss of income and earning capacity, impairment of his ability to work, emotional and physical distress, loss of reputation, humiliation and embarrassment, and will continue to suffer such damages in the future.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Dr. Stanley M. Berry respectfully requests this Court grant the following relief:

- find that Defendants discriminated against Plaintiff in violation of Title VI of the Civil Rights Act of 1964, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1983, and the Elliott-Larsen Civil Rights Act;

- award Plaintiff compensatory damages;

- award Plaintiff punitive damages;

21

- award Plaintiff reasonable attorneys' fees and costs; and

- award Plaintiff such other relief as this Court deems necessary and proper.

Respectfully submitted,

By: */s/ Amanda M. Ghannam*
Amanda M. Ghannam (P83065)
Schulz Ghannam PLLC
645 Griswold St., Suite 4100
Detroit, MI 48226
(313) 788-7446
amanda@michiganworkerlaw.com
Counsel for Plaintiff

April 11, 2024

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 11, 2024, a copy of the foregoing document was filed via the Court's CM/ECF system, which will cause an electronic copy to be served on all counsel of record.

*/s/ Amanda M. Ghannam*